ORIGINAL PLEADING
INDEX NO. 241
6-17-03

# In the United States Court of Federal Claims

No. 01-201 L

(Filed June 17, 2003)

FILED
JUN 17 2003
U.S. COURT OF
FEDERAL CLAIMS

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * | * | |
| CAROLE and ROBERT TESTWUIDE, et al., | * | |
| | * | Overflight Takings; Motion |
| *Plaintiffs,* | * | for Class Certification; RCFC 23; Deficiency of Proposed |
| | * | Method of Class Certification; |
| v. | * | Certification of Issue to |
| | * | United States Court of |
| THE UNITED STATES, | * | Appeals for the Federal |
| | * | Circuit |
| *Defendant.* | * | |
| | * | |
| * * * * * * * * * * * * * * * * * * | * | |

*Kieron F. Quinn*, Towson, Maryland, attorney for plaintiffs. *Martin E. Wolf*, Towson, Maryland; *Thomas Shuttleworth, Stephen C. Swain* and *Lawrence Woodward*, Virginia Beach, Virginia; *Jack E. Ferrebee*, Virginia Beach, Virginia; and *Charles R. Hofheimer* and *Kristen Hofheimer*, Virginia Beach, Virginia, of counsel.

*David Shuey* and *Julia K. Evans*, Washington, D.C., for defendant. *Robert J. Smith*, Navy Litigation Office, Washington, D.C.; *LCDR Jude Klena*, CINCLANTFLT, Norfolk, Virginia; and *LT Florencio J. Yuzon*, NAS Oceana, Virginia Beach, Virginia, of counsel

---

**OPINION & ORDER**

---

**BUSH**, *Judge*

On April 5, 2001, nine named plaintiffs filed a complaint and motion for class certification in this court alleging a taking by the United States due to aircraft operations from Naval Air Station Oceana (NAS Oceana; Oceana) or Naval Auxiliary Landing Field, Fentress (NALF Fentress; Fentress). Specifically, plaintiffs claim that the use and enjoyment of their residential property has been destroyed or substantially interfered with by the operations of nine squadrons and two replacement squadrons of F/A-18 C/D aircraft, and they seek just compensation for the value of their allegedly taken property. This order and opinion is limited to the question of whether the court should grant plaintiffs' motion for class certification. For the following reasons, plaintiffs' motion for class certification is denied.

## BACKGROUND

### I. Factual Background

#### A. Relocation of 156 F/A-18 Hornets

In 1993 and 1995, the Department of Defense Base Closure and Realignment Commission mandated the closure of NAS Cecil Field in Florida under the Defense Realignment and Closure Act of 1990, (BRAC) 10 U.S.C. § 2687, thereby necessitating the relocation of eleven squadrons of F/A-18 Hornet fighter aircraft to other Navy and/or Marine Corps airfields. Pursuant to the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-70d, the Navy developed screening criteria and prepared an Environmental Impact Statement (EIS) in connection with moving the Atlantic Fleet F/A-18s. The EIS documented the existing use of the subject aircraft; projected environmental impacts at three proposed facilities; and projected the increased use and impact for each of five realignment scenarios. After applying the screening criteria to potential sites along the East Coast, on May 18, 1998, the Navy decided to send 9 F/A-18 C/D squadrons, consisting of 12 F/A-18s each (108 aircraft), and the Fleet Replacement Squadron (FRS), consisting of 48 F/A-18s, from NAS Cecil Field to Oceana. The remaining two F/A-18 C/D squadrons were transferred to MCAS Beaufort, South Carolina. A challenge to the Navy's decision was rejected by the United States District Court for the Eastern District of Virginia and affirmed on appeal to the United States Court of Appeals for the Fourth Circuit. See Citizens Concerned about Jet Noise v. Dalton, 48 F. Supp.2d 582 (E.D. Va. 1999), *aff'd*,

217 F.3d 838 (4th Cir. 2000).

NAS Oceana, located in Virginia Beach, Virginia, has as its primary mission the support of fleet and training squadrons and commands on aircraft carriers in both the Atlantic Ocean and Pacific Ocean. Since the 1940s, Oceana has evolved to become the center for naval jet traffic along the East Coast, and is of strategic importance to the national security and defense of this country. In 1972, Oceana was chosen to be the home base of the Navy's then-newest tactical aircraft, the F-14 Tomcat. By 1976, F-14 squadrons along with the Atlantic Fleet's newly formed F-14 Training Squadron or Fleet Replacement Squadrons were based at Oceana. Throughout the 1980s, both F-14s and A-6s continued to operate from Oceana.

Oceana covers 5,650 acres and has seven miles of active runway systems. Fentress, located approximately 12 miles from Oceana in Chesapeake, Virginia, comprises 2,300 acres and has one runway. Fentress serves as an outlying field for operations at Oceana. Oceana has three runways that are 8,000 feet long; Fentress also has a 8,000 foot long runway. The 8,000 foot runways are designed to simulate the landing deck of a carrier and are used to provide training to both fleet squadrons and training squadrons.

**B. Training for F-18 Hornet fighter pilots**

The training for on-deck carrier landing is known as Field Carrier Landing Practice (FCLP) and requires pilots to operate the aircraft exactly as they would while landing on a carrier at sea. Field Carrier landing is generally recognized as one of the most difficult and dangerous activities undertaken by military aviators. FCLP is intended to familiarize pilots with carrier landing approaches and must be conducted at set times and under set conditions, including hours throughout the night.

The flight operations for the relocated F/A-18 fighters, which are the subject of the instant dispute, commenced in approximately July, 1998. Accordingly,

plaintiffs allege a taking as of July, 1998.[1] The flight paths of the F/A-18 fighters are directly over or in close proximity to the property owned by plaintiffs and the proposed class. They allegedly produce significant levels of noise and vibration, thereby interfering with plaintiffs' use and enjoyment of their property and diminishing the value of plaintiffs' property. Accordingly, argue plaintiffs, the operations of the F/A-18 fighter jets constitute a taking without payment of just compensation violative of the Fifth Amendment to the Constitution.

### C. Activity levels and noise levels

#### 1. Activity levels and ATAC Corporation's analysis

The EIS documents the present and projected future level of operations at Oceana and Fentress based on an airfield and airspace analysis conducted by ATAC Corporation of Sunnyvale, California (ATAC). The airfield and airspace analysis, dated February 18, 1998 was developed using a computer simulation model, NASMOD.

NASMOD, which includes advanced database and analytical capabilities, was developed to meet the Navy's need for a scientifically accurate tool to objectively and efficiently analyze options in a number of naval aviation operations. NASMOD is derived from: (1) Navy air training system model (NATS), and (2) SIMMOD, the official simulation model used by the Federal Aviation Administration to make analogous studies of civilian airports.

The data used by ATAC in its analysis is compiled from: (1) records of actual air field and air space operations, including air traffic control facility logs, traffic analyzer data and squadron flight schedules; (2) publications; and (3) personal interviews and observations of operations. NASMOD generated the baseline operations at Oceana prior to the arrival of the F/A-18s and established the projected level of use for the first full year following the realignment.

---

[1]/ At at least one point in their motion for class certification, however, plaintiffs allege a July 1, 1999 date of taking. Because of this inconsistency, it is unclear exactly what government action plaintiffs claim is the cause of the alleged taking.

## 2. Noise levels and the Wyle Report

Based on the activity levels established by ATAC, noise exposure levels and projections were calculated by another Navy contractor, Wyle Laboratories, Inc. (Wyle; Wyle Labs). Wyle develops aircraft noise exposure contours at various Navy installations. In calculating the noise contours which show geographical areas exposed to particular noise levels, Wyle Labs used a suite of computer modeling programs, NOISEMAP, developed by the Air Force, the lead Department of Defense agency for aircraft noise modeling. NOISEMAP compares before and after noise effects from proposed operational changes and allows the Navy to calculate the noise of proposed actions. It accounts for installation-specific operation data such as flight tracks, type and mix of aircraft, frequency/times of operation, altitude and performance parameters such as power and airspeed.

Noise contours for Oceana and Fentress were first developed approximately 25 years ago as part of the Navy's Air Installation Compatible Use Zones program (AICUZ; the program), which was established in the early 1970s to address community noise and safety impacts. AICUZ requirements are set forth in Chief of Naval Operations Instruction (OPNAVINST) 11010.36A which identifies both accident and noise impacts from Navy and Marine Corps air stations, and are similar to those required of civilian aircraft and airports by the Noise Control Act of 1972. The program allows the Navy to evaluate noise generated from routine operations and provides a basis for the Navy to work with communities and local governments to promote compatible land use development in the vicinity of its airfields. The noise exposure contours for Oceana and Fentress both before and after the arrival of the F/A-18s are set out in a report to the Navy dated February, 1998 and incorporated into the EIS (Wyle Report; February, 1998 Wyle Report). This report is also summarized in the EIS.

The Wyle Report reflects a marked contrast between noise exposure during the baseline year of 1997, and that projected during 1999, the first full year after arrival of the F/A-18s. The model was re-run in 2001 and the revised projections reflect smaller noise contours than those projected in the February, 1998 Wyle Report. In generating both sets of noise contours, Wyle Labs used the federal standard for aircraft noise exposure in communities around airfields and airports,

the day-night average sound level (DNL) expressed in decibels (dB).[2] DNL is the average sound level generated by all aviation related operations during an average 24-hour period. In calculating DNL, sound events during nighttime hours are increased to account for lower background noise and for the greater community sensitivity to noise during these times. Nighttime hours are defined as the period from 11:00 p.m to 7:00 a.m.

### D. Proposed class action certification

On April 5, 2001, plaintiffs filed their class action complaint for inverse condemnation. In this complaint, plaintiffs allege that the proposed class of persons represented by plaintiffs is composed of those persons whose use and enjoyment of residential real property has been destroyed or substantially interfered with since July 1, 1998 by the operations of F/A-18 fighter jets from NAS Oceana and NALF Fentress over and around plaintiffs' property. There are nine named plaintiffs, including: (1) Carole and Robert Testwuide who have lived at 916 North Oriole Drive since 1986; (2) Karen and Robert Green who have lived at 114 London Bridge Road for the past seventeen years; (3) Grace and Joseph LoCasto who have lived at 1105 Murray Drive near the Fentress auxiliary landing field; (4) George Bunn who owns the property located at 320 A Scott Lane in the Oceana Gardens neighborhood; and (5) Sandra and James Lyle who own the

---

[2]/ Human perception of sound involves two characteristics, intensity and frequency. Frequency is the number of times per second the air vibrates.

Sound intensity is measured in a logarithmic unit known as a decibel. Normal speech has a sound level of about 60 dB, and 120 dB is the threshold of pain. Because decibels are logarithmic and not linear, comparing sound levels is not a matter of simple addition or subtraction. There are, however, some generally accepted rules for comparing sound levels. If a sound's intensity is doubled, the increase is 3 dB. In terms of the present controversy, then, doubling of 60 dB DNL is 63 dB DNL, not 120 dB DNL. Another important factor when measuring average sound over a period of time, such as DNLs is the time-average sound level, which is dominated by the louder sound levels during the averaging period.

Sound frequency is measured in cycles per second or hertz (Hz). Humans can hear sounds that range in frequency between 20 Hz to 15,000 Hz but are most sensitive to sounds in the 1,000 to 4,000 Hz range. When measuring environmental noise, the high and low frequencies are adjusted to approximate the reduced sensitivity to those frequencies. This adjustment is called A-weighting and is used by Wyle Labs in measuring environmental noise.

property located at 950 Maryland Avenue in the Shadowlawn neighborhood of Virginia Beach. Plaintiffs propose certification of two sub-classes:

> **Class 1 - 80+ dB DNL**: Owners of all residential properties as of July, 1998, located in a noise zone of 80 or more dB DNL in the 1999 Noise Contours for NAS Oceana or NALF Fentress and in a noise zone of at least 5 dB DNL lower in the 1997 Noise Contours, both as established by Wyle Laboratories, Inc. in report 97-10 dated February, 1998.
>
> **Class 2 - 65-79 dB DNL**: Owners of all residential properties as of July, 1998, located in a noise zone of 65-79 dB DNL in the 1999 Noise Contours for NAS Oceana or NALF Fentress and in a noise zone of at least 5 dB DNL lower in the 1997 Noise Contours, both as established by Wyle Laboratories, Inc. in report 97-10 dated February, 1998.

Plaintiffs request that the court certify this class as an "opt out" class.[3]

## II. Procedural Background

On April 5, 2001, plaintiffs filed their class action complaint for inverse condemnation and motion for class certification with three volumes of supporting exhibits. Defendant filed its answer on June 1, 2001. In its order of September

---

[3]/ It bears noting that historically this court has been inclined to certify "opt-in" classes rather than "opt-out" classes. <u>See e.g. Quinault Allottee Ass'n v. United States</u>, 453 F.2d 1272 (1972). Addressing this topic, the Rules Committee Note to Rule 23 of the Rules of the United States Court of Federal Claims as revised May 1, 2002 states:

> Additionally, unlike the federal rule, the court's rule contemplates only opt-in class certifications, not opt-out classes. The latter were viewed as inappropriate here because of the need for specificity in money judgments against the United States, and the fact that the court's injunctive powers – the typical focus of an opt-out class – are more limited than those of a district court.

28, 2001, the court determined that the most expedient and appropriate approach to this case was to first resolve the issues raised by plaintiffs' motion for class certification and defendant's opposition thereto. Thus, the court limited discovery proceedings to the issue of class certification.

Discovery on the class certification issue was characterized by contention between the parties, thus precipitating the filing of a host of motions with the court. During a February 7, 2002 Rule 16 conference the court ruled as follows on the subject motions: (1) plaintiffs' motion to compel production of documents filed October 15, 2002 was denied; (2) the United States' motion to compel discovery responses filed December 20, 2001 was denied; (3) plaintiffs' motion for protective order filed December 20, 2001 was granted and the defendant was precluded from accessing plaintiffs' personnel records; (4) plaintiffs' motion to compel production of documents requested in plaintiffs' third and fourth request for production filed January 14, 2002 was denied; (5) defendant's motion to quash subpoenas issued to Wyle Laboratories and ATAC Corporation and for a protective order to prohibit the depositions of Jeff Borowy and John Harder until the court holds a Rule 16 conference was granted; (6) plaintiffs' motion to compel defendant to produce imaged documents and associated electronic files filed January 25, 2002 was denied; (7) defendant's motion to compel Rule 34 compliance filed January 28, 2002 was denied; (8) defendant's motion for order on sequencing of class certification discovery filed February 5, 2002 was denied as moot; and (9) defendant's motion to compel interrogatory responses filed February 5, 2002 was denied.

Further, during the Rule 16 conference the court closed discovery for the purposes of class certification and ordered defendant to file its response and/or opposition to plaintiffs' motion for class certification on or before March 6, 2002. The court further ordered that no evidentiary hearing would be held on the matter of class certification and that pretrial proceedings would be suspended pending the completion of briefing on the issue of class certification. The court memorialized these determinations in an order of February 7, 2002.

On March 12, 2002, defendant filed its opposition to plaintiffs' motion for class certification and exhibits in support thereof. Then, on April 9, 2002, plaintiffs filed their motion for sanctions and to exclude certain witnesses whose testimony defendant had relied upon in support of its opposition to plaintiffs'

motion for class certification. The motion to exclude was based, *inter alia*, on the fact that the court had terminated discovery at the February 7, 2002 conference, thus depriving plaintiffs of the opportunity to learn of and depose, if necessary, certain witnesses whose testimony the defendant had relied upon in support of its opposition to plaintiffs' motion for class certification. In turn, on April 25, 2002 plaintiffs filed their reply memorandum in support of plaintiffs' motion to exclude expert declarations and for sanctions. Also on this date, plaintiffs filed their reply memorandum in support of class certification and exhibits thereto.

On June 7, 2002, this court denied plaintiffs' motion to exclude witnesses and for sanctions filed April 9, 2002, and re-opened discovery to afford plaintiffs the opportunity to take limited depositions of certain witnesses whose testimony was presented by the government in support of its opposition to plaintiffs' motion for class certification. Plaintiffs then elected to depose several of the witnesses on whose testimony the defendant had relied. Subsequently, on August 22, 2002 plaintiffs notified the court that they did not intend to revise their reply memorandum in support of class certification.

## DISCUSSION

### I. Jurisdiction

The court has jurisdiction over this matter pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1), as this action presents a claim for inverse condemnation against the United States founded upon the Fifth Amendment to the United States Constitution.

### II. Certification of a class action

#### A. Legal standard

Rule 23 of the Rules of the Court of Federal Claims (RCFC) as revised May 1, 2002 provides as follows regarding certification of class actions:

> **(a) Prerequisites to a Class Action.** One or more members of a class may sue as representative parties on behalf of all only if (1) the class is so numerous that

> joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims of the representative parties are typical of the claims of the class, and (4) the representatives will fairly and adequately protect the interests of the class.
>
> **(b) Class Actions Maintainable.** An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
>
> (1) the United States has acted or refused to act on grounds generally applicable to the class, and
>
> (2) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by members of the class; and (C) the difficulties likely to be encountered in the management of a class action.

This rule, as revised, governs the court's decision on certification of a class action in this matter. See RCFC 86 (stating that "[t]hese rules as revised . . . govern all proceedings . . . in actions then pending, except to the extent that in the opinion of the court their application in a particular action pending when the rules take effect would not be feasible or would work injustice"). The court bases this determination on the fact that the court's revised Rule 23, in the main, adopts the criteria for certifying and maintaining a class action set forth in Quinault Allottee Ass'n v. United States, 197 Ct. Cl. 134, 453 F.2d 1272 (1972). See Rules Committee Note to revised RCFC 23. Because Quinault is the seminal case in this court regarding class certification, it is the precedent that the court would have applied in the context of the former RCFC 23, which invoked a broad

discretionary standard for class certification. Thus, it will not "work injustice" in the meaning of RCFC 86 for this court to apply revised RCFC 23.

In Quinault, 453 F.2d at 1276, the court enunciated the requirements for class action certification, namely:

> (1) members must constitute a large but manageable class; (2) there is a question of law common to the whole class; (3) a common legal issue overrides separate factual issues affecting the individual members; (4) the claims of the present plaintiffs are typical of the claims of the class; (5) the government must have acted on grounds generally applicable to the whole class; (6) the claims of many claimants must be so small that it is doubtful they would be otherwise pursued; (7) the party plaintiffs must adequately and fairly protect the interests of the class without conflicts of interest; and (8) the prosecution of individual lawsuits must create a risk of inconsistent or varying adjudications.

Buchan v. United States, 27 Fed. Cl. 222, 224 (1992) (citing Quinault, 453 F.2d at 1276). The Quinault test is conjunctive; that is, failure to satisfy any one of the Quinault requirements is fatal to a motion for class certification. Banner v. United States, 38 Fed. Cl. 700, 703 (1997).

It bears noting that the Court of Federal Claims and its predecessor have never certified a class action in an overflight takings case. See Unpublished Order in Russell v. United States, No. 92-309L (Ct. Cl. June 1993), *appealed sub nom*, Argent v. United States, 124 F.3d 1277 (1997) (stating that "[t]he flight impact upon the divergent parcels of land for which broad class action status is sought has not been shown to be sufficiently similar to support a class certification"). Other courts have likewise declined to certify classes in airport noise cases. Bieneman v. City of Chicago, 864 F.2d 463, 465 (7th Cir. 1988), *cert. denied*, 490 U.S. 1080 (1989); Town of East Haven v. Eastern Airlines, Inc., 331 F. Supp. 16 (D. Conn. 1971) (citing the following variables in its discussion of the merits of the case: the distance of the plaintiffs' residences from the airport; whether the planes passed over the residence and, if so, at what altitude; the frequency of the flights; the

amount of noise and vibration from the overflights; the effect of the flights on the plaintiffs; and the effect of the flights on the properties' fair market value); Virginians for Dulles v. Volpe, 344 F. Supp. 573, 575 (E.D. Va. 1972); City of San Jose v. Superior Court of Santa Clara County, 525 P.2d 701 (Cal. 1974) (finding plaintiffs' scheme for certification of a class based on overflights failed because (1) certain plaintiffs would be required to disregard all liability for other forms of damages, *i.e.*, actual physical injury to the property; (2) the scheme is incompatible with the maxim that each parcel of land is unique; (3) the requisite number of subclassification would quickly approach the total number of parcels in the class because of the number of uniqueness variables; and (4) there were too many factual differences between the putative class members' claims, as no one factor, not even noise level, would be determinative as to all parcels).

**B. The parties' arguments on class certification**

**1. General positions**

The crux of plaintiffs' motion for class certification is that it is possible to: (1) delineate two classes of plaintiffs based upon the 1997 Noise Contours, as established by Wyle Laboratories in report 97-10 dated February, 1998 and home ownership within the noise contours as of July, 1998; (2) determine definitively the identity of each property within each of the noise contours; and (3) calculate the ensuing damages for each plaintiff. In support of their position, plaintiffs present extensive argument in support of the validity of the 1997 noise contours. Plaintiffs further contend that the issues of (1) whether the facts establish a Fifth Amendment taking; (2) the intensity and duration of the aircraft noise prior and subsequent to July, 1998 and its effect on plaintiffs' property; and (3) the amount by which the value of the property is diminished by the taking, are predominant common questions involving common proof which will likely require expert testimony to facilitate their resolution.

Defendant states that plaintiffs' theory (if two properties are identical in all respects, except one property is exposed to greater aircraft noise, then the property experiencing greater noise will necessarily have a lower market value than the other property) must be rejected, as it has never been presented to a court of law or relied upon in support of class certification. The defendant further argues that avigation easement claims cannot be tried on a "one size fits all" formula and that

such claims turn on individualized proof, *e.g.* "[e]ach element must be established for each parcel, and evidence of a taking over one parcel in a case does not, without more, support a finding of taking over other parcels." Persyn v. United States, 34 Fed. Cl. 187, 196 (1995). In sum, the defendant argues that the common legal issues are outweighed by separate factual issues.

### 2. Parties' positions on calculating damages class-wide

The parties focus the majority of their argument on plaintiffs' conclusion that damages in the form of diminution in value as a result of the allegedly dramatic increase in noise from the realignment of the F/A-18s can be calculated on a class-wide basis. Plaintiffs contend that the damages for the subject properties could be calculated through use of a formula. This formula, proposed by Professor John Nelson, plaintiffs' expert witness, involves multiplying the Noise Depreciation Index (NDA) (either 1% dB or 1.5% dB, depending on the noise zone) by the increase in dB sustained by a property to determine the percentage decrease in value, and then applying this percentage decrease to the fair market value of the subject properties prior to the alleged taking. Plaintiffs argue that the requisite data to complete this calculation would be available. Plaintiffs also contend that such damages have been identified and calculated in dozens of studies throughout the United States and other countries using recognized methodologies to isolate the economic effect of aircraft noise.

Regarding plaintiffs' proposed methodology for calculating damages, defendant argues that: (1) plaintiffs' theory assumes injury from noise exposure and calculates damages based on that assumption without any market evidence showing that a particular property's value has actually diminished; (2) plaintiffs' proposed damages calculation theory, which assumes a reliable linkage between an increase in noise exposure and a consistent, uniform decrease in property values, is speculative, unproven, and unsupported; (3) Dr. Nelson's extrapolation of the decline in housing prices from statistical analysis of other markets is unreliable, misleading and lacks probative value; and (4) plaintiffs' theory is inconsistent with the particularized evidence of damages that is required for a finding of a taking.

Both parties present opinions of numerous experts and rely upon extensive documentation in support of their respective positions. They also level substantial

criticism at one another's experts.

## C. Analysis

The Fifth Amendment to the United States Constitution provides that private property shall not be taken for public use, without just compensation. U.S. Const. Amend. V. Since the Supreme Court decided the seminal case of United States v. Causby, 328 U.S. 256 (1946), federal courts have confirmed that the United States may convert private property to public use in violation of the Fifth Amendment by its operation of aircraft. See Argent v. United States, 124 F.3d 1277, 1281 (1997) (citing Griggs v. Allegheny County, 369 U.S. 84, 88 (1962); Brown v. United States, 73 F.3d 1100, 1102 (Fed. Cir. 1996)).

In Causby, the plaintiffs owned and occupied 2.8 acres of land near a military airport in North Carolina. Causby, 32 U.S. at 258. Plaintiffs complained of the effects of the government's flight of various aircraft from this airport, including bombers, transports, and fighters. Id. at 258-59. These aircraft came close enough to plaintiffs' property, at times, to appear barely to miss the tops of the trees and, at times, came so close to the tops of the trees as to blow the leaves off. Id. at 259. The noise emanating from these aircraft was "startling." Id. Consequently, plaintiffs were forced to close their chicken farming operation.

In its analysis concluding there was a taking of an avigation easement within the meaning of the Fifth Amendment, the court found that the "ancient doctrine that the common law ownership of the land extended to the periphery of the universe . . . has no place in the modern world," as "[t]he air is a public highway." Id. at 261. The court did, however, reason that: "[I]f, by reason of the frequency and altitude of the flights, respondents could not use [their] land for any purpose, their loss would be complete. It would be as complete as if the United States had entered upon the surface of the land and taken exclusive possession of it." Id. Central to the Court's conclusion that the landowners were entitled to compensation for their loss was the fact that the overflights were "so low and so frequent as to be a direct and immediate interference with the enjoyment and use of the land." Id. Significantly, the flights passed directly over the property at altitudes as low as 83 feet. Id. at 258-59.

The court emphasized the physical interference with the plaintiffs' use of their land:

> The path of glide for airplanes might reduce a valuable factory site to grazing land, an orchard to a vegetable patch, a residential section to a wheat field. Some value would remain. But the use of the airspace immediately above the land would limit the utility of the land and cause a diminution in its value.

Id. at 262. See also Argent, 124 F.3d at 1282; Griggs, 269 U.S. 84 (1962).

Cases following Causby have concluded that flights above 500 feet in non-congested areas are in the public domain, *i.e.*, in navigable airspace. See Stephens v. United States, 11 Cl. Ct. 352, 358-59 (1986) (citing numerous cases for this proposition). In congested areas, the navigable airspace begins at 1,000 feet. Id. See also 14 C.F.R. § 91.119 (1998).

Thus, Causby requires the court to consider the viability of a takings claim based on frequent flights at low altitudes directly over the plaintiffs' property. The Federal Circuit has articulated the general test emanating from Causby and its progeny to be as follows: Plaintiffs must establish (1) that the planes flew directly over the claimant's land; (2) the flights were low [below either 500 feet in non-congested areas or 1000 feet in congested areas] and frequent, and (3) the flights directly and immediately interfered with the claimant's enjoyment and use of the land. Brown v. United States, 73 F.3d 1100, 1103 (1996) (citing Causby, 328 U.S. at 266). See also Stephens, 11 Cl. Ct. at 359. The Federal Circuit has also noted that the caselaw following Causby adds a gloss on the third factor, requiring that the interference with enjoyment and use be "substantial." Brown, 73 F.3d at 1102.

Since Causby, however, courts have acknowledged that noise and vibrations have replaced physical encumbrance as the primary complaint of claimants seeking compensation. See Argent, 124 F.3d at 1282. Thus, courts have modified the test of Causby in limited situations. One such situation was that before this court in Branning v. United States, 654 F.2d 88, 101-02 (1981), *aff'd*, 784 F.2d 361 (Fed. Cir. 1986), which involved an action for recovery of just compensation for the alleged taking of an easement over plaintiff's property by inverse

condemnation as a consequence of the operation of Marine Corps aircraft over the property. The court allowed recovery for the effects produced by jet aircraft, despite the claimant's inability to allege any flights under 500 feet. Id. at 90. This is significant, because, as previously stated, in Causby, the existing statutes and regulations as applied were interpreted to mean that the "navigable airspace" began at 500 feet above the Causby's land. Id. at n. 13. Branning involved military aircraft training exercises, not unlike those at issue in the case at bar, in which planes practiced noisy takeoff and landing operations designed to simulate landing on an aircraft carrier at sea. Id. at n. 3. One exercise involved groups of planes flying circles in ten "racetrack" loops around a landing strip, making ten touch-and-go landings on the airstrip before the planes required refueling. Significantly, the court concluded that defendant's use of airspace at altitudes above 500 feet, independent of landing and takeoff, may be a taking of land beneath if the use is "peculiarly burdensome." Id. at 90 (stating that "The novelty of this decision is in its holding that defendant's use of airspace at altitudes above 500 feet . . . may be a taking of land beneath if the use is peculiarly burdensome"). The court deemed the particularly noisy and intrusive character of the training exercises a "vital factor" in its decision. Id.

In sum, the Branning court acknowledged the general rule that flights over 500 feet did not constitute a taking, but found that the government's liability for a taking is not precluded merely because the flights of government aircraft are in what Congress has declared to be navigable airspace and subject to its regulation in cases in which there is a peculiar burden imposed by the aircraft operations at issue. See also Griggs v. Allegheny County, 369 U.S 84, 88-89 (1962) (Where flights along a glide path above the plaintiff's land, while below 500 feet, were nevertheless within the navigable airspace as declared by Congress in the 1958 Act, and the Supreme Court held that a taking had occurred despite the fact that some of the activity complained of was within the navigable airspace of the United States as defined by Congress and as determined by the applicable regulations). The Branning decision was affirmed by the Federal Circuit. Branning v. United States, 784 F.2d 361 (1986).

The Federal Circuit also departed from the Causby test in Argent v. United States, 124 F.3d 1277 (1997), a case alleging the taking of an avigation easement based on the frequent and noisy aircraft operations at the Naval Air Station at Whidbey Island, Washington, designed to simulate the landing of an aircraft at

sea. In this case, the Federal Circuit premised its decision on the idea that "overflight takings disputes defy per se rules or classification." Id. at 1282. The court noted that with the increased prominence of jet airplanes, noise and vibrations have replaced physical encumbrance as the primary complaint of claimants seeking compensation. Id. at 1282.

The Federal Circuit's departure from Causby in Argent however, was different than that in Branning. In Argent, the offending flights did not pass directly over plaintiffs' property. Rather, plaintiffs argued that the rearward blast of the jets destroyed their enjoyment of their property even when the aircraft did not fly directly over their land. Id. at 1282.[4] The Argent court recognized that "where a plaintiff complains only of noise resulting from normal aircraft operations, not passing directly overhead, this court follows the general rules springing from Causby to deny recovery." Id. at 1284 (citing Avery v. United States, 165 Ct. Cl. 357, 330 F.2d 640, 645 (1964); Batten v. United States, 306 F.2d 580, 585 (10th Cir. 1962)). Significantly, however, the court found "where as here, plaintiffs complain of a peculiarly burdensome pattern of activity, including both intrusive and non intrusive flights, that significantly impairs their use and enjoyment of their land, those plaintiffs may state a cause of action." Id.

Thus, in Branning, the court found a taking in a case wherein one factor of Causby, that the flights occur outside of navigable airspace, was not satisfied, and in Argent, the court found that plaintiffs were not precluded from asserting a taking of an avigation easement when another factor of Causby, that the flights pass over the plaintiffs' property, was not satisfied.

Although it is not the intention of the court, at this juncture, to make any determination on the merits of this matter or the sufficiency of plaintiffs' allegations, the controlling precedent involving avigation easements is nonetheless critical to this court's determination of the question presently before the court – whether this case should be certified as a class action lawsuit.

---

4/ Although the court in Argent did generally state some evidence in the case indicated the flights were "low," the court did not expressly base its decision on altitude. Rather, it based its decision on the facts established before the court, *i.e.*, noisy flights not passing directly over plaintiffs' property.

Errata page per Court 6/23/03

As discussed at length *supra*, the plaintiffs seek to certify two classes based on the following factors: (1) noise zone contours; and (2) home ownership as of July, 1998. Significantly, however, this proposed method of creating classes suffers from a severe analytical defect which was not raised by the defendant. As set forth *supra*, the present state of the case law in the Federal Circuit is that where there is a peculiarly burdensome pattern of recovery, plaintiffs may recover if either (1) the offending flights do not pass directly overhead and the remaining Causby elements are satisfied, Argent; *or* (2) the offending flights occur within navigable airspace and the remaining Causby elements are satisfied, Branning. This is very significant in the context of the pending motion for class certification because it could well be that some or all of the members of the proposed classes experience primarily or exclusively (1) flights that do not pass directly overhead; *and* (2) flights that occur inside of navigable airspace. The plaintiffs do not attempt to include these factors into the proposed methodology for creating classes in this case. Insofar as this court is aware, it would be a case of first impression within this court and this Circuit if the court were to establish as a matter of law that the plaintiffs could recover for a taking of an avigation easement when the flights did not pass directly overhead and flights occurred inside of navigable airspace. Thus, it would be entirely inappropriate for the court to grant plaintiffs' motion for class certification because the inquiry of whether the class could be certified based on noise and home ownership alone is inextricably fused with the legal question of what plaintiffs must establish in order to prove a taking within the meaning of the Fifth Amendment.

A related problem with certifying plaintiffs' proposed class is that if, assuming *arguendo*, the court concluded that plaintiffs could not establish a taking based on noise alone, then it would be necessary for the court to divide the proposed class members into groups of (1) property owners who experienced flights directly overhead and outside navigable airspace; (2) property owners who experienced flights directly overhead yet within navigable airspace; (3) property owners who experienced flights not directly overhead yet outside navigable airspace; (4) property owners who experienced flights not directly overhead yet within navigable airspace; and (5) property owners who experienced flights neither directly overhead nor outside navigable airspace. The court would then be faced with the situation of ascertaining the legal sufficiency of these claims for each of these different groups. For certain of these groups, based on the controlling precedent, the court would then need to ascertain whether the activities

were sufficiently burdensome to justify recovery. Argent, 124 F.3d at 1284; Branning, 654 F.2d at 90. The results may differ based on the specific factual circumstances and variables affecting each group that go to the root of the question of whether a taking occurred. Accordingly, plaintiffs' proposed methodology for the delineation of classification is not viable in view of the existing precedent.

There is also at least one other defect in plaintiffs' theory underlying their motion for class certification. That is, it is up to the court to determine as a matter of law the date of the taking. Plaintiffs' pleadings themselves reflect different dates of takings. See *supra* n. 1. Thus, the court cannot certify a class based on home ownership as of a date that has not been determined as a matter of law to be the date of the alleged taking.

## III. Certification of the issue of class certification to the United States Court of Appeals for the Federal Circuit

The Rules Committee Note to RCFC 23 expressly states that the court's rule does not contain a provision comparable to Federal Rule of Civil Procedure (FRCP) 23(f), which provides a party may lodge, with the permission of the court of appeals, an interlocutory appeal of a court order granting or denying class certification. The Federal Circuit has also acknowledged that the Court of Federal Claims does not have a comparable provision to FRCP 23(f). See Christopher Village, L.P. v. United States, 25 Fed. Appx. 922 (2001) (Table). The Court of Federal Claims may, however, certify questions to the Court of Appeals for the Federal Circuit pursuant to 28 U.S.C. §§ 1292(b) and 1295. Title 28 U.S.C. § 1292(d)(2), the corollary standard of certification to that employed by the United States District Courts in 28 U.S.C. § 1292(b), provides, in pertinent part:

> [W]hen any judge of the United States Court of Federal Claims, in issuing an interlocutory order, includes in the order a statement that a controlling question of law is involved with respect to which there is a substantial ground for difference of opinion and that an immediate appeal from that order may materially advance the ultimate termination of the litigation, the United States Court of Appeals for the Federal Circuit, may, in its

> discretion, permit an appeal to be taken from such order, if application is made to that Court within ten days after the entry of such order.

It is a rare case that warrants certification of an interlocutory appeal from the Court of Federal Claims pursuant to 28 U.S.C. § 1292(d)(2). See e.g. Northrop Corp. et al. v. United States, 27 Fed. Cl. 795, 798-99 (1993) (discussing extensively the standards for certification of an interlocutory appeal pursuant to 28 U.S.C. § 1292(d)(2)). An interlocutory appeal occurs "'only in exceptional cases' so to avoid unnecessary delay and expense as well as piecemeal litigation." Id. at 799 (citation omitted).

The Court of Federal Claims has recognized three distinct, statutorily-based criteria for certification of an interlocutory appeal, including:

> (1) a controlling question of law; as to which there is
> (2) substantial ground for difference of opinion; and that
> (3) possible material advancement of the ultimate termination of the litigation will occur if the certification order is issued

Northrop, 27 Fed. Cl. at 799 (quoting Favell v. United States, 22 Cl. Ct. 132, 143 (1990)).

In view of the significance of this matter and the critical importance of being assured of the correctness of the decision on class certification prior to proceeding with the merits of this matter, the court deems this to be an extraordinary case warranting interlocutory appeal. To be certain, there is a controlling question of law before the court: Whether this matter should be certified as a class action. Further, there is substantial ground for difference of opinion on the issue of class certification. This fact is reflected, in part, by the fact that this court's decision is based on a premise not raised by either party. See discussion *supra* (analyzing an analytical defect inherent in plaintiffs' proposed method of creating classes). The court had to carefully consider the arguments of both sides and engage in a very thorough analysis of the questions raised in pleadings to reach its decision not to certify the class. The Federal Circuit may

deem it appropriate to expand existing precedent or apply existing precedent in such a manner as to render plaintiffs' proposed method of class certification viable. Also significant to the question of the existence of a substantial ground for difference of opinion is that there is no case of which this court is aware in which plaintiffs have invoked the same theories as plaintiffs with such specificity in an attempt to certify a class in an avigation easement case. See discussion *supra* of plaintiffs' theories. By its very nature, the question of whether to certify a class is fact specific. In reaching this determination, the court notes that a trial court may certify a question for interlocutory appeal while continuing to find that its own resolution of that question was correct. Coast Federal Bank v. United States, 49 Fed. Cl. 11, 14 (2001).

Also, possible material advancement of the ultimate termination of the litigation will occur if the certification order is issued. Whether interlocutory review of this question would materially advance the resolution of this case depends in large part "on considerations of 'judicial economy' and the need to avoid 'unnecessary delay and expense' and 'piecemeal litigation.'" Id. at 14 (quoting Northrop, 27 Fed. Cl. at 800-01). Significantly, counsel for plaintiffs have represented to the court that they currently represent more than 2,000 property owners in the noise zones. Plaintiffs' attorneys further represent that many more property owners will retain them if the proposed class is not certified. Thus, there are likely many similar suits waiting to be lodged in this court pending final resolution of the issue of class certification. The correct procedure for the case at bar and the other possible cases must, necessarily, be dictated by the decision as to class certification. It would vitiate the proceedings in this court if it were to proceed with the merits of plaintiffs' takings action exclusively for the named plaintiffs only to be advised later of the incorrectness of its decision on plaintiffs' motion for class certification. Also, the plaintiffs who would have been members of the proposed class would be severely prejudiced due to the passage of time if they were to delay filing suit pending the ultimate resolution on appeal of the class certification issue.

Accordingly, the court deems it necessary to certify for interlocutory appeal to the Federal Circuit the question of the appropriateness of certifying this matter as a class action.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** as follows:

(1) Plaintiffs' motion for class certification, filed April 5, 2001, is **DENIED**;

(2) The court **CERTIFIES** that the issue of whether this matter should be certified as a class action presents a controlling question of law with respect to which there is a substantial ground for difference of opinion; and that an immediate appeal from this order with regard to that question may materially advance the ultimate termination of this litigation;

(3) All proceedings in this matter are **STAYED** pending further order of the court; and

(4) In accordance with 28 U.S.C. § 1292(d)(2), should plaintiffs wish to seek the permission of the United States Court of Appeals for the Federal Circuit to take an appeal from this order, they must apply to the Federal Circuit by or before **June 27, 2003**.

LYNN J. BUSH
Judge